Welcome to the U.S. Court of Appeals for the Fifth Circuit. We'll call the first case for today, which is the United States of America v. Darrell. The first is Mr. Gregory Park. May I proceed, Your Honor? Yes, sir. The basis for this appeal is that Mr. Darrell respectfully submits that there were no facts, no specific and articulable facts, which would support reasonable suspicion that criminal activity was afoot at the time of his seizure. On September 13, 2017, two officers were dispatched to the house of Ms. Brandy Smith. They had a misdemeanor warrant for her arrest for failure to appear at a court proceeding. When they arrived at the residence, they pulled their cars into the driveway and parked behind a black Chevrolet Camaro. This Camaro was parked in front of one of the posts supporting the carport. It was an open carport. The first patrol car parked four to five feet behind the black Camaro, the second patrol car four to five feet behind the first. Two to three seconds after the officers arrived, they testified that Mr. Darrell exited the driver's side of the black Chevrolet Camaro and began walking toward the carport. Within a few seconds, the first officer on the scene ordered Mr. Darrell to stop. His words were, stop, don't walk off. At that point, Mr. Darrell allegedly began walking faster. There was a second order a few seconds after the first saying, stop, come back. We submit that this show of authority was the seizure of Mr. Darrell, and at that point, there were no specific and articulable facts of criminal activity. The district court asked— How is this different from Illinois v. Wardlaw? In Illinois v. Wardlaw, you had a situation where the officers were in a high crime area, and Mr. Wardlaw apparently— Wasn't this a high crime home? The officer testified that it was a known drug house. However, there were no reports of any criminal activity in the area, and the warrant was not— I thought there was a report that there had been a killing at that house previously. There had been a shooting, supposedly. A shooting, yes. However, we do not know the circumstances of any of the arrests, whether they involved drugs or violence. We do know that the officer testified there had been a shooting. More importantly, we don't know how recent any of those activities may have occurred. Did the officer say they knew that when they approached the house? Yes, sir. The second officer on the scene testified that he had made several arrests at the residence. Judge Noda, to go back to your question about Wardlaw, Wardlaw saw the caravan of police cars, and that's the language from the case, a caravan. There were four patrol cars with eight officers, and when they arrived, he immediately took flight. And they described this as headlong flight, meaning that he was running. And this is not the situation with Mr. Darrell. First, Officer Latch testified that when he arrived at the residence and Mr. Darrell exited the vehicle, Mr. Darrell never turned around to look at them, never saw them. Did he have a—did they notice he had a sack in his hand, or did that come later? That came a few seconds later, sir. When he exited the vehicle, he just began walking toward the carport. He was immediately ordered to stop. At that point, the officers did not notice any weapons in his hand. He did have a brown paper bag in one hand, but the officers did not understand the contents at that point. After he was ordered the second time to stop, he returned or went to the officers. When he was standing there with one of them, the officer noticed that he had knife sheaths in the waistband of his pants. Based upon that, for officer's safety, a pat-down occurred. They discovered a firearm in his pocket along with alleged methamphetamine, and he was placed under arrest. When asked by the district court what crime did the officers suspect Mr. Darrell of contemplating or being involved in, they cited a Mississippi misdemeanor statute for hindering prosecution by rendering criminal assistance. In other words, if you warn somebody and encourage their flight because of— What brought the officers to that site? The arrest warrant. They were there to serve an arrest warrant on Ms. Brandy Smith. And Brandy Smith, she was in the vehicle, and she got out and went to the house? Or was it the same person, or was Brandy Smith in the house? Brandy Smith was not at the location, sir. I'm sorry? She was not there. Okay. The person who was found in the vehicle after the arrest was an elderly gentleman named Donald Dunn. Okay. Apparently the Camaro had tinted windows, and Mr. Dunn's presence was not noticed until after the arrest. But the prosecution offered to the court this hindering prosecution crime, and we think there are numerous reasons why that fails. The first is that in most cases, as Judge Hope pointed out, there's the indication that someone observes the presence of police, and then they break into a run or a headlong flight. There's no indication that Mr. Darrell knew that the police were there. Secondly, even if he knew that they were there, he would not have known why they were there. Are you saying that he heard the word stop but didn't know who was saying stop? Is that the idea? Well, we don't know if he heard the first order. I thought you had said, and I thought the briefs reflected, that after the stop order came, he either ran or at least walked more quickly. He picked up his pace, I think, is what you said this morning. That's the testimony. The officer said that he walked faster, and on cross-examination— Doesn't that suggest that he heard the word? It could, certainly, but there could also be innocuous reasons why he increased his pace. He could have gotten past the front of his car. He could have gotten around the post to the carport. Fair enough, but we're talking about the reasonable suspicion standard, which is a standard based on the officer's understanding. Correct. So from a perception standpoint, you're telling me the testimony is clear that the officers perceived him to be speeding up in response to the stop order. And that is a possibility, but the realization is that that comes after he's already been ordered to stop. He's already been given a show of authority, as mentioned in Perry v. Ohio and this court's opinion in U.S. v. Montsevious in 2017. By a show of authority, someone is deemed to be speeding. That first order came before he walked faster. On cross-examination again, I asked the officer about the increase in pace. He said he did not run. I asked, did he increase his pace by a little bit? The officer said, yes, sir. So we're talking about somebody slightly increasing their pace. It's not the type of headlong flight that's contemplated in prior case decisions. But again, our submission going back to the theory that he was hindering prosecution is that not only is there a question of whether he knew the police were at the location, he would not have known why they were there. Arrest warrants are not a matter of public record, not until they're served and a return is placed in a public court file. For all Mr. Darrell would have known, they could have been called there to render assistance to somebody or there could have been a noise complaint, any number of reasons why the officers could have been there that day. The third reason is because there's no information that suggests Mr. Darrell knew whether or not the house was occupied. There were no other cars on the driveway. There were no indications that somebody was inside the house. And so the question is begged, how would he have known to warn somebody of the presence of police? And even if he had warned them, the second subsection of that statute talks about warning somebody in order to get them to comply with a request by police or because the police are looking for someone. And we don't know what Mr. Darrell would have done in that circumstance. Another noteworthy point is that the allegation is not that Mr. Darrell was actively committing a crime. What was submitted to the district court was that if he had gotten behind the house, he could have warned any occupants. With this theoretical assumption that he could have committed a crime, we submit it does not rise to the level of constitutional scrutiny. And the fourth reason that we would submit why this submission is in essence pretextual is that if you take the prosecution's theory to its logical conclusion, in any time officers are executing an arrest warrant, they could seize anybody in the vicinity because of the potential that they could hinder the prosecution by warning somebody. So we submit that the hindering of a prosecution does not hold merit. How was Darrell dressed? How was he arrested, sir? Dressed. Oh, I'm sorry, sir. If I remember correctly, he was wearing a pair of shorts. But apparently the knife sheaths were in plain view. However, they were not noticed until after Mr. Darrell had been seized. But based upon their observations of those knife sheaths, they made them. You don't have shorts. Did he have on a jacket? There's no information about that in the record, Your Honor. We know this was in September of the year. We would assume it would be fairly warm, but I cannot submit whether he had a jacket or not. But the handgun was found in his front pocket. Was Darrell's car parked in the driveway or was he parked on the street? He was parked in the driveway about four to five feet from the first post of the carport. There are some photos in the record that give the general idea. This was a very open area. There were no other houses right nearby or buildings, very few trees, and they were in the rear right side. Other than that, it was an open area with a fairly well-kept yard. The driveway was lengthy, according to the officers, sufficient enough for three cars to be lined up right behind one another. And part of the seizure of Mr. Darrell, too, would include the fact that his car was blocked in and he couldn't have left. I mean, certainly he could have run away or tried to, but his car was also blocked in. The prosecution relies pretty heavily on the case of United States v. Rideau, a 1992 decision out of the circuit. We submit that these cases are not analogous. The reason why is that Rideau basically is focused on the search of Mr. Rideau. Mr. Darrell's case is about his seizure. In Rideau, this was also a high-crime area, but unlike Darrell, this was at night. It was at 1030 at night when the officers found Mr. Rideau standing in the middle of the street. They activated their lights to encourage him to move to the side of the road, and as he tried to move to the side, he stumbled, leading them to reasonably believe that he might be intoxicated, which would be a violation of Texas law. They pulled over and began questioning him. They not only suspected public intoxication, but they were concerned about his welfare since he was standing in the middle of the road at night in the dark and also the concern for public safety since other motorists may have to swerve to avoid hitting him. So based upon those reasons, they certainly had a reasonable suspicion of criminal activity and also a solid basis in terms of public safety for seizing him. Thereafter, there was a search, and they found a firearm. In Mr. Darrell's case, we're submitting that there was no such evidence of criminal activity and no issues regarding public safety, which would warrant— So you had two patrol cars or one patrol car? There were two marked patrol cars. Both officers were armed and in uniform. The warrant was for the arrest of Brandy, and that home is where they were parked, correct? It was where the car driven by Mr. Darrell was parked, yes, sir. And was he walking toward the house where Brandy was supposed to be? He was walking toward the carport, yes, sir. There's no information to suggest that Mr. Darrell had ever been there before or that he even knew Brandy Smith. There's no indication that he knew whether the house was occupied or not. From the viewpoint of the officers, an individual who did not exit the car when the police arrived then steps forward and moves toward that house, could a police officer really perceive that this person, seeing two patrol cars arrested, when two patrol cars drive up there, they're presumably there to make an arrest, to do something with regard to the house. Are they reasonable to conclude that that person may be attempting to alert the people inside the house? We do not believe so, Your Honor, based upon the fact that there are any number of reasons why the officers could be there. And even if they were there to arrest somebody, it would not have been known to Mr. Darrell or the general public. Also, as mentioned, there was no indication that anybody was located inside the residence. And in terms of the officers' perception, Officer Latch testified that when Mr. Darrell exited the car, he never looked back at them. So in other words, there is an issue as to whether or not he was alerted to their presence before exiting the vehicle. Did you say what time of day this was, this occurred? The submission to the court, and this was, the district court asked the prosecution prior to the hearing of getting completely underway, did this happen during broad daylight, did it happen during the day, and the prosecutor conceded that he believed it was, but there was no testimony elicited from the officer one way or the other. But that's what the record reflects. And, Your Honor, in our brief, we have cited two primary cases from the Fifth Circuit, which we believe are analogous to Mr. Darrell's situation. We believe that his seizure is in violation of the Fourth Amendment and the principles under Terry v. Ohio and this law's prior findings. Unless Your Honors have any questions, I see my time is running short. Thank you. Thank you, sir. Yes, sir. Mr. Leary? Yes, Your Honor. Thank you. My honor to be here and to speak not only before this tribunal, but also on behalf of two law enforcement officers who walk up to me and say, what did we do wrong? And that's how they view this. And what happened in September of 2017 was that Officer Billingsley, who's with the Farmington Police Department, gets an arrest warrant for Brandy Smith, and he calls for backup. And the reason he does that is it is a known drug house, that numerous arrests have occurred there, and it's a shooting has occurred there. So we asked Deputy Latch to accompany him there for security. So they both drive to Brandy Smith's residence and pull into the driveway in two marked vehicles. One, two. They're in the driveway. There's a black Camaro in front of them. Now, what's happening here is instantaneous. They have no time to think about what Mr. Darrell's mental state may be. In fact, it's not relevant. What is relevant is what is seen from the viewpoint of these two officers. Is this unusual circumstances that they could reasonably conclude that criminal activity is afoot? So this is what they see. They pull up, and immediately Darrell gets out of his car instantaneously. I think that it is illegitimate for us to think that he just got out of his car for the heck of it. Well, but if it's instantaneous, then it's equally plausible that this was just what he was going to do anyway, isn't it? Is there any evidence that he was reacting to the arrival of the police? Yes, there is, from this standpoint. He gets out of his car. Now, I understand that defense would like for us to think he's walking to the carport, but that is not what the facts show. And it's very important. I would just point to the record excerpts on page 95 and 109 that Officer Latch testified specifically that he's going to the back of the house. He's not going to the house. He's not going to the carport. He's going to the back of the house. How did they determine that without reading his mind? Well, the car is parked right in front of the carport. One of the officers or both said he was going to the back? Both, yes. Officer Latch said that that's where he was going. So he gets out of the car. They're behind him. He's walking down the side of the house. So they conclude that he's going to the back of the house. And on page 97 of the record excerpts, Officer Latch says that based on his training, he cannot let this man get out of his field of vision. And this is all prior to the first stop order? This is prior to the first stop order. He's walking down the side of the house. Which side of the house is the carport on? Well, if I'm facing the house, it's on the left side. And the driveway is coming straight out. They said he was walking down the right side of the house. Or he was walking down the far left side of the house. How does that show that he wasn't going to go in the carport door? Well, that's where the end of the house is. So the end of the house is on the far left side. He gets out and is walking towards the back of the house, outside the side of the house. He's past the end of the carport, right? Well, the first stop order occurs when he's walking down the side of the house. And in response to your question, Judge Hope, he doesn't respond to the stop order. In fact, he starts walking faster. And so that is my—he doesn't stop. We don't have a seizure at that point. He ignores the stop. He starts walking faster. I think opposing counsel's point is what is your reasonable suspicion in order to justify the first stop order? Since the first stop order is the show of force. Well— So in terms of that, I take it what you're saying is it's not just that he's leaving the car, because that could be just innocent continuation of prior activity. It's where he's going and specifically towards a house that is a known place of criminal activity. And I would respectfully assert, is it reasonable for them to conclude when he's walking down the side of the house, the far side of the house, that he's going to the back of the house? They've only got a second. They've got one to decide this. So the point is, what's the innocent explanation for going—normally you go to a house, you go to the front door. Well, and it's interesting that Terry accepts the potential that an innocent person could be stopped under Terry. It is possible that that could happen. And so the standard is, do they have reasonable articulable suspicion? The Rydow case says some minimal level of objective justification. This is what we get into these terms. So can this law enforcement officer allow him to get behind the house? And what he said is, Judge, I can't do that. But is your point that it's unusual for somebody to be doing that as opposed to going to the front door? Yes. Is that sort of the idea? That would be my position. And why would that be unusual? Just spell it out for us. Because of the timing, these officers pulled right in behind him, and the moment they pulled up, he gets out and starts walking down the side of the house. The district judge says there's nothing suspicious about any of that, didn't he? Didn't he say if this house were in the city and it was not a known drug house, that there would be no reasonable suspicion of criminal activity? Didn't he say something to that effect? The district court judge? Yes, sir. I don't recall that, but I read that somewhere. I wouldn't argue with that because the case cited by defense counsel, the Hill decision, which is where law enforcement officers are on a roving patrol. They're just driving around, and they pull into the Palmetto apartments, and they park next to Hill. Hill's in the passenger side of the car. The driver gets out and starts to walk away. And based on what the driver does— No, no, she was not the driver. They search Hill, who was the passenger. No, he was the driver. Okay. It was his car. It was his car. He was sitting in the driver's seat. She gets out, goes to her apartment, starts to her apartment. They stopped her. She played no part. That played no part in the case with respect to Hill. Because they searched Hill. Really, Hill was sitting innocently in a vehicle. Right. And in this case, that is not what happened here. And, in fact, in the Hill case—and I know Your Honor authored the decision—it was an interesting statement in the Hill decision. It says context is the key. And the context of Hill was we got officers on a roving patrol that just pull up next to a car in an apartment complex. That's not what we have here. Here we have officers that are duty-bound to serve an arrest warrant. They've got to be there. What concerns me is I kind of think the district judge, if he did say that, is right. But he said the fact it was a known drug house and they were serving a warrant makes all the difference. That kind of concerns me. Does that mean that the police can say any place they're getting ready to search is a known drug house, and therefore anything that occurs is a reasonable suspicion of a crime? Yes, Your Honor. And I appreciate that, but I think we need to look at—almost look at the layers of this case. Because, yes, it is a known drug house where crimes have occurred, and officers are not charged with ignoring that fact. They've got to take that into consideration. So they got some help. Billingsley got some help. And then when they pull up there, we've got that element there. And then we see a man, right when they pull up, get out of his car and start to walk away, heading to the back of the house. Now, in that moment, they have to make a decision. We've got a known criminal location. We've got the conduct of this driver walking away from the officers. We've got a split, instantaneous decision. Do we let him get behind the house? Because if he gets behind the house, Your Honor, I would respectfully assert that it's rational, it's reasonable for us to think, what happens now? If he's behind the house and they can't see him, what happens? Because Terry tells us that when we make our reasonable, articulable determination, that several things go into that evaluation. The experience of the officers, common sense, and the inferences from the factual scenario that we have. If he gets behind that house, it's a game changer. You would concede Judge Dennis' point, I assume, that the mere fact that this is a potential criminal area, known drug house, alone is not enough. It's not enough. Right. So if Darrell walked out of the car at the exact moment of arrival and walked in a different direction, that's not suspicious. Totally different scenario. Right. That could be a good— The law enforcement officers. Right. That could all be an innocent continuation of prior activity. So it seems to me what you're saying, if I understand you correctly, is the key distinguishing factor is that he's walking toward the back of the house, and that's somehow unusual. Is that the idea? It's unusual from this standpoint. There's a case cited by the defense, the Micheletti case. It's a 94 Fifth Circuit case. And law enforcement officers go behind a bar. They pull up to a bar, and an individual runs behind the bar. So law enforcement officers go, golly, this guy's running from us. So they go behind the bar, and they are talking to this guy. And the individual walks out of the bar, and he's got his hand in his pocket and a beer in his hand, and he's walking straight at the police officers. Okay? Now, they tell him to stop. Now, why did they do that? In and of itself, walking out of the back of a bar with your hand in your pocket is not against the law. A beer in your hand? But officers have to make an instantaneous determination, is this potentially dangerous? Which really is what happened in Terry, the seminal case here. Terry watched these guys just walking in front of a building. It's completely legitimate activity. Nothing criminal about walking in front, back, and forth. They were casing out a shot. But what they're doing is not illegal. They're just watching. And the law enforcement officer says, wait a second, this guy's made a dozen passes in front of this store. Something is unusual here. And the standard is criminal activity afoot. It's not probable cause. It's some minimal layer, level of justification. And so, with that being in mind, the officer approaches and frisks and finds a gun. And we're not supposed to look at the, you know, Darrell in this case has got a gun in his pocket. And I understand and appreciate that that's not the determinative factor. It's not. But we're telling these officers, be smart. And based on your experience, know what's going on around you. Because you've got to get home tonight. But you're understood and obviously sensitive to all of that. Your point is it's unusual to walk to the back of the house. A normal person would walk to the front of the house. Is that sort of the idea? That's it. And I think it's reasonable for us to conclude, from the officer's standpoint, Your Honor, it's reasonable for them to conclude that this guy saw them when they pulled up. Two marks. It's not any house. It's a house where they're about to serve a warrant in a high-crime area. They've got to go there. If that guy gets behind the house, now they can't go to the front door. They've got to walk around the house. They've probably got to draw their weapon. And they've got to walk around the house to see what's going on. Now we've just elevated this whole situation with drawn weapons going behind the house. I don't understand why that necessarily follows. Why couldn't they just let the guy go about his business and go do their business, go to the door, front door, and try to serve the warrant? They weren't going to bust in there without knocking on the door, were they? No. And, again, I'll just go back to page 97 on the record that serves. The officer said, I can't let him get outside my field of vision and get behind the house. Why? Because he's assuming a risk there. It's a known drug house. There's been shootings there before. Anybody around there is suspected of a crime and is suspected to be dangerous and going to attack the police. The only—what makes this suspicious is not that he gets out of his car and walks, but he's walking away, and he's entitled to walk away, but the officers have to make a determination when he gets behind the house out of their field of vision. That's what they have to—they have to stop that before it happens. So this case should stand for the behind-the-house rule. You know, I think that there's—the Ward Law case that you spoke of earlier, it talks about there's no empirical data that you can point to to identify all the circumstances that can arise in a Terry situation. That was a flat-out flight. Ward Law was flat-out flight, and that was this one. Hill was a different circumstance that we had to look at the facts on. We've got the Rydell case where the guy is drunk on the side of the road. That's a different evaluation. And this particular case is the guy walking away, getting out of their field of vision case at a known drug location. You'd concede if another person was there walking up and down the sidewalk, walking away from that house, or otherwise just not on that very same property? No. There would be no reasonable suspicion as to any of them? Absolutely. So it's all— Darrell had just gotten out and walked towards law enforcement and said, I'm Justin Darrell. Now, they would have seen a knife on him, and so they would have—I'm sure they would have searched him. But if he had no knife, there's nothing suspicious about holding your hand out. There's nothing suspicious about just sitting in the car. Just sit there. But the getting out and leaving, walking to get out of their field of view, Your Honor, I would respectfully assert that is the reasonable—it is reasonable, and it's articulable, and it's suspicious activity because it causes the law enforcement officers to change their course of conduct at this location. I would respectfully assert that the Hill case is distinguishable because they were on a roving patrol actually just looking for stuff. These guys were not. They weren't looking for anything. They're just trying to execute their warrant. If there are no further questions, I'll sit down. Thank you, judges. Thank you. Mr. Park, you have five minutes on—four minutes. On rebuttal. I'm sorry. May I proceed, Your Honor? Yes, sir. First, Your Honor, I would like to address something that Mr. Leary stated in his comments about the officer being on the scene because this was a known drug house, and he needed backup, and that's not what the record reflects. On page 9 of the transcript from the suppression hearing, the officer is asking or answering the question of why he was there. Realize this is Officer Shane Latch, who is an Alcorn County Deputy Sheriff. They have jurisdiction in that county. The arrest warrant was from the city of Farmington. And Officer Latch testified, and I quote, Since the address was in the county, I advised him I would go with him to help serve the warrant since it was out of the city limits of Farmington. Not because it was a known drug house and there was some concern. It was a jurisdictional issue. We would also note that in terms of this theory of Mr. Darrell going behind the house, Officer Latch testified he never got more than 20 to 25 feet away from his car. In other words, he wasn't even on the other side of the carport. And we suggest there's nothing inherently suspicious about somebody being behind a building or behind a house. You concede that's not typical. If somebody's visiting a house, they typically go to the front door, don't they? Your Honor, I would not concede that. And the reason why is because, especially in the country, and especially I grew up in a very similar house, and we always, always used the carport door. That's where you parked your car. It was the quickest access inside the house. We hardly ever opened our very front door. And I would assume that a law enforcement officer would go to that front door just out of courtesy and respect. But I do not concede that using the front door is the logical and obvious entrance to the house. But did the officer say that he was not headed to the carport door? He was headed to the back of the house? Your Honor, Officer Latch testified, and again the transcript bears this out, that he wasn't sure where Mr. Darrell stopped. He did not have him in his line of sight because of his own truck, and I'm talking about Officer Latch's truck. All he testified to was where or how far away Mr. Darrell was from his car when he turned around. Now the idea of him going to the back of the house, even if that is the case, we still do not concede that that's reasonable suspicion of criminal activity. And I would note there are two distinct times during the suppression hearing when Officer Latch was asked, did you observe Mr. Darrell engaged in any criminal activity? Had he committed or been involved in any criminal activity, or was he about to be involved in any criminal activity? At both times, both separate times, he answered no. So I understand Mr. Leary's point about this being a split-second decision. The officers could have easily handled this in a different manner. Sir, would you mind speaking to us for a second, please? There are other ways they could approach this without a show of authority. They decided to do that instantaneously without there being reasonable suspicion that he was about to enter prosecution or that he had any weapons on him. Instead of saying stop, they should have said sir. Well, they could have easily gotten his attention since Officer Latch testified that he never looked back at them. They didn't even know. They could not say that Mr. Darrell knew that they were there. They could have gotten his attention without ordering him to stop. Well, of course, this is not somebody on a public street. An officer asks him to stop, and he goes about his own business. This is at a very specific site, and the officers are there to serve a warrant, which is one of the most dangerous jobs that police officers engage in. There's a lot of police officers serving domestic relations warrants. That's a dangerous situation. As I read this record, it was a site of criminal activity, and they were going there to arrest someone. Now, if I look at court law, the Supreme Court majority opinion gave great weight to flight or moving away in and of itself and with a high crime area. It's a 5-4 decision, but the four justices did not disagree with the principle. They were sitting on the basis of the credibility and the underlying factual determinations themselves. So my concern is, and I've stated it to you so you can respond to it, is that the question views from the viewpoint of the police officers. In this context, what we're asking you to say is that they should let this guy go on. They have no reasonable basis for stopping him, which put them in concern that the person inside has been warned that the police officer there to serve a warrant. If it's just a reasonable suspicion that that's the case, then why isn't that enough for them to at least stop the person and to conduct a frisk, which is what they did, and the man found the man armed? That's not my holding on anything. I'm just saying that's an argument here that I'd like you to confront because I read ward law as a very strong statement out of a 5-4 decision. It's virtually unanimous as to the operative principle. Your Honor raises three main points. The first one in regard to ward law is that there is a difference between the headlong flight of him taking off and running versus Mr. Darrell increasing his pace. Yes, precisely, but let me pick you up on that point. But here you have a person, it's not headlong flight, but he's moving toward the house, which is the object of the police officer's charge to make an arrest, and it is a crime scene itself. Yes, sir, but in terms of that, Mr. Darrell had no reason to know why the officers were there, whether their target was the house or not. He may not have, but the question is not whether the person arrested had reason to know anything. It's whether the police officer, looking at this situation, they drive up in two patrol cars and they're going to make an arrest, and this individual is there and they ask him to stop, he doesn't, and then he's walking away from them, and at that point what does the police officer do? There are several possibilities that a regional police officer is going to confront, one of which is if it's a high crime area and he has to be wary of individuals that are in that area prior to shooting. All I know is I hear these cases, but walking away from a police officer when you have fear that he's armed is very dangerous to the police officer because if they have a weapon, they take two steps away from him, expose the weapon, and then turn. We see those in police shooting cases, and we hold police officers accountable for all these circumstances. I'm just trying to put to you, are we asking too much of these police officers in this situation? Your Honor, we realize that there are situations like this when somebody is found to be in possession of a firearm and they should not have been, but we believe that the Constitution is there to protect the people in the sense that under Terry and all this project. Of course it is. The question is trying to apply it in an even-handed way that you truly do vindicate the mighty principles of a free citizen, and that's the difficulty of it. You're very articulate. You do a very good job, and I appreciate that. I'm just trying to get you to address my concerns about that. Yes, sir, and there's not a situation where an officer performs his duties where there's not the potential for danger. The question in this case is under the Fourth Amendment, was there reasonable suspicion? And to go back to Your Honor's other two points, in terms of being a known drug house, there's no indication that there had been recent criminal activity there. Number two, in terms of that arrest warrant being a domestic violence or some type of other warrant, one involving drugs or violence, it's none of the above. It was a misdemeanor failure to appear. So the risk level, while we concede it's there in every situation, we think that it's— Is it true or not there had been a shooting in the place before and it was a known drug house or not? The officer testified that he had made several arrests there, that it was a known drug house to him, and that there had been a shooting there. Okay. We don't know, again, how recent those things were. It's not a peaceful home. Well, that could be, Your Honor, but the question is did it happen five years ago or ten years ago, and we don't know the answer to that. Okay. There's nothing further than that. Thank you, Your Honor. Thank you, sir. This will be submitted with Carl. The next case for argument today.